**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.  1:14CR232 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | OPINION AND ORDER |
| | ) | |
| | ) | |
| RANDY T. SMITH, | ) | |
| | ) | |
| DEFENDANT. | ) | |

Defendant Randy Smith seeks to suppress all evidence seized from him and statements made by him during an encounter with police on June 4, 2014 (Doc. No. 24). The government opposes the motion (Doc. No. 25). The Court conducted an evidentiary hearing on the motion on November 5, 2014. At the conclusion of the hearing, the Court took the matter under advisement.

I. **BACKGROUND**

According to the government, defendant was observed walking along a city street with an opened bottle of beer, he fled the scene when he was approached by police officers, he was eventually apprehended by officers, and, after the capture, an opened beer bottle and plastic baggie of marijuana were found nearby. It is the government's position that this chain of events gave officers reasonable suspicion to, at a minimum, perform an investigatory stop. Defendant insists that he did not have a bottle in his hand—open or closed—and that he only fled the scene because he did not recognize the approaching individual as a police officer. He claims that the police had no basis to

stop him because there was no evidence that he had violated any laws. Both sides agree, however, that once apprehended, a second bag of drugs and a weapon were found on defendant's person. Additionally, it is undisputed that defendant made certain statements to the officers during the stop. Defendant was ultimately charged with being a felon in possession of a weapon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). (Doc. No. 28 [Superseding Indictment].)

At the hearing, Cleveland Municipal Housing Authority ("CMHA") Detective Robert Vales testified that, on June 4, 2014, he and his partner, CMHA Detective Thomas Williams, were patrolling the area of East 40th Street and Woodland Avenue in Cleveland, Ohio. The detectives were not wearing police uniforms, but did have certain police insignia visible on their shirts, and they were travelling in an unmarked police cruiser. Detective Vales testified that his partner noticed defendant walking along the sidewalk with an opened beer bottle in his hand. Carrying an open container of alcohol in public is a citable offense, under Ohio Rev. Code § 4301.62.[1] Williams turned from East 40th Street onto around Case Court toward defendant to investigate the possible violation, and Williams and Vales asked defendant to approach the vehicle. According to Vales, both detectives identified themselves as police officers. Defendant did not comply, but, instead, placed his hand in his waistband and then attempted to flee. Detective Vales exited his vehicle and gave chase.

Around this same time, CMHA Patrol Officer Antonio Camargo and his partner, CMHA Patrol Officer Ali Sabeiha, were patrolling the area in a marked police

---

[1] Section 4301.62(b)(3) provides that "[n]o person shall have in the person's possession an opened container of beer or intoxicating liquor . . . in any . . . public place [not specifically excluded by statute]."

2

cruiser. Both officers were in full uniform. Responding to the report from dispatch of a man matching defendant's description fleeing from officers, Officer Camargo spotted defendant running, exited his vehicle, and began to purse defendant on foot. At the hearing, Officer Camargo testified that when defendant saw him approaching at a run, he seemed shocked. He further testified that he observed defendant carrying a green bottle in his left hand, and saw defendant make a motion with his right hand toward the waistband of his shorts. Because of this motion, Officer Camargo became concerned that defendant was concealing a weapon in his shorts, and he instinctively reached for his own revolver. Officer Camargo eventually caught up to defendant and grabbed him from behind, at which time the contents of the bottle—which Officer Camargo deduced from the smell was beer—spilled all over the officer and defendant discarded a plastic baggie onto the ground. After defendant was secured, Officer Camargo found the baggie, which contained marijuana, near defendant. He also examined the green bottle, which had previously been in defendant's left hand and was lying on the ground, and determined that it was a bottle of Yuengling Lager beer.

Detective Vales and his partner caught up to defendant after he had been secured by Officer Camargo. Vales testified that he approached defendant, and when he asked him if he had anything on his person about which the officers should know, defendant responded that he had "a little weed." A pat-down by officers disclosed a plastic baggie containing 17 individually wrapped bags of marijuana from defendant's pocket. Detective Williams mirandized defendant, and Detective Vales escorted

---

Violation of the open container law is a minor misdemeanor.

defendant to the marked cruiser. While walking back to the car, defendant volunteered that he was "dirty." Detective Vales testified that he was not familiar with the expression, which purportedly referred to the possession of a weapon. According to Detective Vales, defendant subsequently clarified by advising officers that he had a weapon in his pocket. It is undisputed that a second pat-down search of defendant revealed a 9mm loaded pistol.

Officer Sabeiha also testified. He stated that he observed defendant running through a parking lot and instructed Officer Camargo to exit the police cruiser and pursue defendant on foot. He testified that he maintained visual surveillance of defendant the entire time his partner pursued him. Like Officer Camargo, Officer Sabeiha indicated that he saw defendant running with a green beer bottle in his left hand. He also testified that a green beer bottle was recovered near where defendant was finally apprehended by Officer Camargo.

Defendant also provided testimony at the hearing. He denied that he had anything in his hands when the CMHA detectives pulled up in a vehicle near him. While he admitted that he heard someone yell out to him to approach, he insists that he had no idea the individual was a police officer. At the hearing, he positively identified Detective Vales as the individual who asked him to approach the unmarked vehicle. He explained that he knew that the detective was the same individual because he got a good look at him while the officer was still in his vehicle, even though he maintained that he never saw the police insignia on Detective Vales's shirt. He stated that he ran away because he had previously been the victim of drive-by shootings and was fearful for his safety.

4

Defendant agreed that he was shocked when he saw Officer Camargo (and Officer Sabeiha in the trailing police cruiser), and that he knew that Officer Camargo was a police officer, but "didn't know what was going on." He added that he subsequently slipped in the grass and was still on the ground when Officer Camargo secured him. With respect to the statements he made at the scene, defendant testified that he volunteered information about the firearm because he did not want to be transported to the police station with a weapon on his person. On cross-examination, defendant admitted that he knew at the time that, by virtue of the terms of his parole, he was not allowed to possess a weapon. He further conceded that he knew that he would be returned to prison if he was found with a weapon in his possession.

## II.  GOVERNING LAW AND DISCUSSION

An officer may conduct an investigative stop with "'reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'" *United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012) (quoting *United States v. Place*, 462 U.S. 696, 702, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983)). "The officer 'must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'" *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989)). Thus, police may stop and question a person for a limited period of time when they reasonably suspect that the person has engaged in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

To determine whether reasonable suspicion existed at the time of the encounter, courts use a "totality of the circumstances" test. *United States v. Carr*, 674 F.3d 570, 574 (6th Cir. 2012) (citation omitted). This analysis is performed in two steps.

*United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005). First, a court must ask whether there was a proper basis for the stop and, if the stop was proper, then the court must "determine whether the degree of intrusion . . . was reasonably related in scope to the situation at hand." *United States v. Carter*, 558 F. App'x 606, 609 (6th Cir. 2014) (quotation marks and citations omitted). Although flight, alone, cannot create reasonable suspicion of criminal activity, a suspect's "'unprovoked flight upon noticing the police' is [one] relevant factor [in the totality of the circumstances analysis]." *Jones*, 673 F.3d at 502 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)).

In the present case, *when* reasonable suspicion is to be determined is as important as *what* facts should be considered. It is well settled that "reasonable suspicion is measured at the time of the detention[.]" *Jones*, 673 F.3d at 501. "The Supreme Court has held police pursuit is not a seizure until the suspect actually stops." *Id*. at 502 (citing *California v. Hodari D*., 499 U.S. 621, 629, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991)); *see United States v. Martin*, 399 F.3d 750, 752 (6th Cir. 2005) ("a seizure does not occur when a mere show of authority occurs, but only when one yields to a show of authority") (citation omitted). Put another way, "one is only seized within the meaning of the Fourth Amendment where an officer applies physical force to restrain a suspect or 'a show of authority [that] has in some way restrained the liberty of a citizen.'" *United States v. Jeter*, 721 F.3d 746, 751-52 (6th Cir. 2013) (quoting *Terry*, 392 U.S. at 19).

In *Jones*, officers observed defendant and another individual engage in a "hand-to-hand transaction," which officers took for an exchange of "cash for drugs." *Jones*, 673 F.3d at 500. When one of the officers exited his vehicle to investigate,

6

defendant fled the scene. During the chase, the pursuing officer observed defendant drop a brown paper bag and other unidentifiable items. After defendant was secured, officers retraced the defendant's escape path and recovered a loaded revolver and a bag with an opened cold beer. *Id*. at 501. In upholding the denial of defendant's suppression motion, the Sixth Circuit rejected defendant's argument that officers had no particularized and objective basis for suspecting him of criminal activity before he attempted to flee. Because defendant did not stop when first approached by police, the court determined that reasonable suspicion was to be measured from the time he was actually stopped and restrained by officers. Thus, the court concluded that defendant's unprovoked flight and attempt to discard potential contraband also weighed in a determination that officers had the necessary reasonable suspicion to effectuate the stop. *Id*. at 502-03.

The Sixth Circuit had the opportunity to revisit this issue the following year in *Jeter*, *supra*. There, defendant paused briefly and then fled when officers "bum rushed" a group of individuals believed to be loitering near a shopping mall. During the chase, officers observed defendant "clutching the right front pocket of his shorts." *Jeter*, 721 F.3d at 750. After they seized him, officers recovered a firearm from defendant's pocket. Rejecting defendant's argument that he was seized when he paused briefly before fleeing, the court found that defendant was not stopped or seized until defendant was captured, by which time defendant had fled the scene and made a gesture suggesting that he had a weapon or contraband that he was trying to secure on his person. *Id*. at 752-53. Finding no evidence that the officers fraudulently attempted to provoke flight or put defendant in a reasonable fear of physical harm if he submitted to their show of authority, the court found that the circumstances leading up to the seizure amply supported

reasonable suspicion, even if reasonable suspicion did not exist when the defendant was first approached by police. *Id*. at 754.

   Here, Detective Vales testified that his partner observed defendant with an open beer bottle in his left hand. This fact was corroborated by Officers Camargo and Sabeiha, who also saw defendant running with a beer bottle in his hand. Detective Vales explained that he routinely investigates suspected violations of Ohio's open container law. Because a violation of Ohio Rev. Code § 4301.62 is a criminal offense, officers had more than "reasonable articulable suspicion" that defendant was engaging in criminal activity, and officers, therefore, had the right to temporarily stop defendant and investigate whether defendant had violated the law; a fact that defense counsel conceded at the hearing. *See Terry*, 392 U.S. at 22-23 (investigatory stop valid where police observed defendants acting in manner consistent with hypothesis that defendants were contemplating a daylight robbery).

   Defendant did not, however, give officers the opportunity to investigate the legality of his actions. Rather, he fled, and officers were required to use force to stop him before they could make that initial investigative inquiry. During the chase, officers saw defendant motion to his waistband as if he had something concealed in his pants, and, when Officer Camargo tackled defendant, the officer witnessed defendant discarding a plastic baggie of drugs. Because defendant was not detained until he was secured by the police, these subsequent acts contribute to a finding that officers had reasonable suspicion to stop defendant. *See Jones*, 673 F.3d at 502; *see, e.g., United States v. Seymour*, 739 F.3d 923, 928-29 (6th Cir. 2014) (defendant was not seized until he was tackled by officers, and the fact that he reached in his waistband for his gun during the police chase

supported a finding of reasonable suspicion).

Defendant testified, however, that he only fled because he thought that the detectives were orchestrating a drive-by shooting. The Court does not find this testimony credible. Defendant was aware that he was not permitted to carry a weapon, and knew that he would go back to prison if he was caught with a weapon in his possession. He, therefore, had ample motive to flee from the police. Additionally, he admitted that he got a good enough look at Detective Vales to clearly recognize him at the hearing, and the Court, therefore, finds it improbable that he did not also notice the police insignia on his shirt.

Of course, even if defendant did not know that the detectives—who were not in full uniform and were riding in an unmarked police car—were law enforcement officials, defendant did not yield to police when an officer in full uniform joined the pursuit. Defendant testified that he was shocked when he saw Officer Camargo, and recognized him as a police officer. Had defendant been concerned for his safety, he should have been relieved that the "police had arrived" on the scene. Instead, he continued to run, suggesting that he was intentionally attempting to evade police.[2] *See, e.g., Jeter*, 721 F.3d at 754 (defendant's actions in fleeing police were not caused by a fear of imminent harm where defendant did not simply get out of the way of police but, instead, purposefully ran down an alley "in a manner suggesting an attempt to escape from law enforcement").

The Court finds it necessary to make one final observation regarding

---

[2] In reaching this conclusion, the Court does not find credible defendant's suggestion that he slipped upon seeing Officer Camargo and simply remained on the ground until he was apprehended.

credibility of the witnesses. At the evidentiary hearing, the Court found some of the testimony of Detective Vales to be suspect, as he clearly had difficulty recalling the circumstances surrounding the encounter, and, at times, appeared confused and disoriented as to the scene of the chase—an area of Cleveland that the detective claimed he was very familiar. Nonetheless, it was Detective Williams, not Detective Vales, who first observed defendant with the opened beer bottle, and Officers Camargo and Sabeiha credibly corroborated both the existence of the opened beer bottle, as well as the other details surrounding the chase and capture.

Because there was reasonable suspicion to support defendant's stop and detention, the Court finds that the evidence seized during the stop should not be suppressed as fruits of a poisonous tree. The portion of defendant's motion seeking suppression of the evidence recovered during the stop is denied.

As for the statements defendant made, it is undisputed that defendant admitted that he had "a little weed" in response to Officer Vales's inquiry into whether he had anything on his person of which the officers should know and before he was read his *Miranda* rights. In *Miranda*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). If the police interrogate a suspect in custody without informing him of the *Miranda* warnings, "*Miranda* dictates that the answers received be

presumed compelled and that they be excluded from evidence at the trial in the State's case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985).

*Miranda* protection extends only to those who, while in custody, are interrogated by persons they know are acting on behalf of the government. *See Ill. v. Perkins*, 496 U.S. 292, 296, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990). In *Rhode Island v. Innis*, the Supreme Court defined "interrogation" as "express questioning or its functional equivalent." 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). The functional equivalent of interrogation consists of "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301; *see United States v. Cleark*, 982 F.2d 965, 968 (6th Cir. 1993) (citations omitted); *see, e.g., United States v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993) (functional equivalent of interrogation to ask suspect to show police where cocaine was hidden during execution of search warrant). "Even a relatively innocuous series of questions may, in light of the factual circumstances and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response." *United States v. Avery*, 717 F.2d 1020, 1025 (6th Cir. 1983) (citation omitted).

Turning to the present case, it is clear that defendant was "in custody" at the time as defendant was placed in handcuffs before Detective Vales inquired of defendant. The Court further finds that the question posed by Detective Vales—do you have anything on you that we should know about—was reasonably likely to elicit an incriminating response. While, as will be discussed *infra*, such a question may be posed for legitimate reasons, any response was likely to implicate defendant in the possession of

11

illegal contraband. *See, e.g., United States v. Williams*, 282 F. Supp. 2d 586, 596 (E.D. Mich. 2003) (inquiry by officers into whether there was anything the officers needed to know or whether there was something in the car constituted interrogation). Because defendant's statement that he "had a little weed" was given in response to custodial interrogation, and before *Miranda* warnings were issued, the statement must be excluded unless an exception to *Miranda* applies.

In *New York v. Quarles*, the Supreme Court held that testimonial evidence obtained directly from a suspect interrogated in custody is admissible despite a failure to give *Miranda* warnings, when a threat to public safety necessitates immediate questioning. 467 U.S. 649, 655-56, 104 S. Ct. 2626, 811 L. Ed. 2d 550 (1984) (response to officer's question about location of gun admissible under public safety exception because defendant was arrested in supermarket wearing empty shoulder holster); *see, e.g., United States v. Talley*, 275 F.3d 560, 563-65 (6th Cir. 2001) (response to officers' question about gun admissible under public safety exception because officers found gun magazine and ammunition during lawful search of residence); *United States v. Webster*, 162 F.3d 308, 332 (5th Cir. 1998) (response to police inquiry whether defendant had any needles in his pockets that could injure officers during pat-down search admissible under public safety exception because of need to protect officers).

Both Detective Vales and Officer Camargo testified that defendant made hand movements toward his waistband upon seeing the police, and Officer Camargo testified that he was concerned that this action was indicative of someone who had a concealed weapon in his possession. Further, Detective Vales testified that he inquired of defendant as to whether he had anything the officers should know about because he was

concerned for his safety and the safety of the other officers. Under these circumstances, the Court finds that the officers were understandably concerned for their personal safety, and, as such, Detective Vales's inquiry fell within the public safety exception. Any response to this reasonable inquiry is, therefore, admissible. *See, e.g., United States v. Jones*, 567 F.3d 712, 717 (D.C. Cir. 2009) (response to officer's question whether defendant had "anything on" him admissible under public safety exception where police had reason to believe that defendant was armed).

As for the statements regarding the gun, there is no dispute that these statements were made after defendant was mirandized, and defendant does not suggest either that the warnings given by Detective Williams were constitutionally defective, or that he did not understand them. Under these circumstances, the Court finds that defendant made these statements after he knowingly and voluntarily waived his right to remain silent.

In fact, defendant testified that he volunteered these statements because he did not want to go to the police station with a concealed weapon on his person. "'[V]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected' by the holding in *Miranda*." *See United States v. Collins*, 683 F.3d 697, 703 (6th Cir. 2012) (statement made following a "factually accurate statement . . . made by an officer to an individual in custody concerning the nature of the charges to be brought . . . ." was not the product of interrogation) (quoting *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) (further quotation marks and citation omitted)). Because defendant, after receiving his *Miranda* warnings, volunteered that he

13

was concealing a weapon during the course of the stop and without prompting from the officers, these statements are not subject to suppression for this additional reason.

**III.  CONCLUSION**

For all of the foregoing reasons, defendant's motion to suppress is denied.

**IT IS SO ORDERD.**

Dated: November 21, 2014

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

14